**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SAVE SANDY HOOK CORPORATION, :
et al.,                      :
                             :    CIVIL ACTION NO. 04-5908 (MLC)
        Plaintiffs,          :
                             :        **MEMORANDUM OPINION**
        v.                   :
                             :
UNITED STATES DEPARTMENT OF  :
INTERIOR, SECRETARY DIRK     :
KEMPTHORNE, et al.,          :
                             :
        Defendants.          :
_____:

**COOPER, District Judge**

## Outline of Opinion

PRELIMINARY STATEMENT                                              1

STATUTORY FRAMEWORK                                                2

I.    THE NATIONAL PARK SERVICE ORGANIC ACT AND THE GATEWAY
      NATIONAL RECREATION ACT                                      2

II.   THE NATIONAL HISTORIC PRESERVATION ACT                       3

III.  THE NATIONAL ENVIRONMENTAL POLICY ACT                        5

IV.   SOVEREIGN IMMUNITY AND THE ADMINISTRATIVE
      PROCEDURES ACT                                               7

V.    THE TUCKER ACT AND THE ADMINISTRATIVE DISPUTE
      RESOLUTION ACT                                               8

RELEVANT FACTS AND PROCEDURAL HISTORY                              11

I.    FACTS                                                        11

      A.   Overview                                                11

      B.   The 1995 Programmatic Agreement                         12

      C.   The Request for Proposals                               13

      D.   The Environmental Assessment                            14

      E.   The Finding of No Significant Impact                    20

      F.   The Lease                                               22

II.   CLAIMS ASSERTED AND PROCEDURAL HISTORY                       25

APPLICABLE LEGAL STANDARDS                                         28

I.    RULE 12(b)(1) STANDARD                                       28

II.   SUMMARY JUDGMENT STANDARD                                    29

DISCUSSION                                                              34

I.    NPSOA AND GNRA CLAIM (COUNT ONE)                                  34

      A.    Objection to the Lease                                      36

      B.    Objection to the Selection of Wassel's Proposal             39

II.   NHPA CLAIM (COUNT TWO)                                            41

III.  NEPA CLAIM (COUNT THREE)                                          46

      A.    Parking                                                     48

      B.    Use of the Leased Premises                                  50

IV.   THE NPS'S DECISION TO LEASE BUILDINGS TO SH PARTNERS WAS NOT
      ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, OR A
      VIOLATION OF LAW                                                  54

CONCLUSION                                                              56

**PRELIMINARY STATEMENT**

Plaintiffs, Save Sandy Hook Corporation and James M. Coleman, Jr. (collectively, "Plaintiffs") filed a second amended complaint on January 1, 2007 against (1) the Department of the Interior Secretary, Dirk Kempthorne, the National Park Service ("NPS") Director, Mary Bomer, and former NPS Regional Director, Marie Rust (collectively, "Federal Defendants"), (2) Sandy Hook Partners LLC and Wassel Realty Group, Inc. (collectively, the "Wassel Defendants"), and (3) the New Jersey Department of Environmental Protection ("NJDEP").  (Dkt. entry no. 43, 2d Am. Compl.)  Federal Defendants move to dismiss the claims asserted against them in the second amended complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) or for summary judgment pursuant to Rule 56.  (Dkt. entry nos. 50-51.)  The Wassel Defendants, insofar as there are claims asserted against them, join in the arguments in support of the Federal Defendants' motion.  (See undocketed 4-10-07 Heksch Letter.)  Plaintiffs cross-move for summary judgment, in effect, pursuant to Rule 56. (Dkt. entry no. 55.)  The Court, for the reasons stated herein, will (1) grant the Federal Defendants' motion for summary judgment, and (2) deny the Plaintiffs' cross motion for summary judgment.

**STATUTORY FRAMEWORK**

**I.    The National Park Service Organic Act and the Gateway National Recreation Act**

The National Park Service Organic Act ("NPSOA"), which created the NPS as a branch of the Department of the Interior, was enacted in 1916.  See 16 U.S.C. § 1.  The NPSOA tasked the NPS with the responsibility for promoting and regulating the use of national parks, monuments, and reservations "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  Id.  The NPSOA gives the Secretary of the Interior the authority to perform certain activities in order to facilitate the administration of the national park system, including "enter[ing] into a lease with any person or governmental entity for the use of buildings and associated property administered by the Secretary as part of the National Park System."  16 U.S.C. § 1a-2(k).  However, such lease must (1) contemplate a use consistent with the purposes established by law for the unit in which the applicable building is located, (2) not result in the degradation of the purposes and values of the unit, and (3) be compatible with NPS programs.  Id.

The Gateway National Recreation Area was created in 1972 "to preserve and protect for the use and enjoyment of present and future generations an area possessing outstanding natural and

2

recreational features."  16 U.S.C. § 460cc.  It is comprised of various lands, waters, marshes, and submerged lands in the New York Harbor area, including the "Sandy Hook unit", which encompasses "the entire area between the Highway 36 Bridge and the northernmost point of the peninsula."  16 U.S.C. § 460cc(a)(3).  The Gateway National Recreation Act ("GNRA") requires the Secretary of the Interior to inventory and evaluate all structures with potential historical significance located in the Sandy Hook unit, and "provide for appropriate programs for the preservation, restoration, interpretation, and utilization of them."  16 U.S.C. § 460cc-2(g).

## II.  **The National Historic Preservation Act**

The National Historic Preservation Act ("NHPA") recognizes, inter alia, that (1) "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development", (2) historic properties, which are significant to this Nation's heritage, are being lost or substantially altered, and (3) "the preservation of this irreplaceable heritage is in the public interest."  16 U.S.C § 470(b)(2)-(4).  Moreover, it establishes that it is the policy of the federal government to encourage the public and private sector to preserve and utilize all usable elements of the Nation's historic buildings and environment.  16 U.S.C. § 470-1(5).  Thus, the NHPA requires the heads of each federal agency to assume

3

responsibility for the preservation of all historic properties
owned or controlled by that agency.  16 U.S.C. § 470h-2(a)(1).

Section 470h-3 of the NHPA states:

> any Federal agency after consultation with the [Council
> on Historic Preservation], shall, to the extent
> practicable, establish and implement alternatives for
> historic properties, including <u>adaptive use</u>, that are
> not needed for current or projected agency purposes,
> and may lease an historic property owned by the agency
> to any person or organization, . . . if the agency head
> determines that the lease . . . will adequately insure
> the preservation of the historic property.

16 U.S.C. § 470h-3(a) (emphasis added).  Section 470f ("Section
106")[1] and its accompanying regulations require a federal agency
to consider the effects its undertakings will have on the
preservation of historic sites, and sets forth a series of
procedures that must be followed by the agency in evaluating
those effects, including a requirement that the agency consult
with the State Historic Preservation Officer ("SHPO").  16 U.S.C.
§ 470f; 36 C.F.R. §§ 800.3-800.13.  An undertaking is considered
to have an adverse effect if it "may alter, directly or
indirectly, any of the characteristics of a historic property
that qualify the property for inclusion on the National Registry
in a manner that would diminish the integrity of the property's
location, design, setting, materials, workmanship, feeling, or

---

[1] Before the NHPA was codified, the contents of section
470(f) appeared in section 106 of Public Law 89-665.  <u>See</u> 89
Pub.L.No. 665, 80 Stat. 915 (1966).  As a result, this provision
is commonly referred to as Section 106 of the NHPA.

association."  36 C.F.R. § 800.5(a)(1).  An agency official, in consultation with the SHPO, may propose a finding of no adverse impact if the undertaking's effects do not meet this criteria. 36 C.F.R. § 800.5(b).

### III. The National Environmental Policy Act

The purpose of the National Environmental Policy Act ("NEPA") is:

> [t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation.

42 U.S.C. § 4321.  NEPA requires, <u>inter alia</u>, that all reports or recommendations pertaining to a major federal action "significantly affecting the quality of the human environment" must include a detailed statement describing (1) the environmental impact of the proposed action, (2) any unavoidable adverse environmental impacts of the proposal, (3) alternatives to the proposed action, (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity", and (5) any irreversible commitments of resources that would be required to implement the proposed action.  42 U.S.C. § 4332(c).  NEPA does not mandate that a federal agency reach a particular result, but instead prescribes the necessary process the agency must employ to reach

its result.  Robertson v. Methow Valley Citizens Council, 490
U.S. 332, 350 (1989).  Thus, "[i]f the adverse environmental
effects of the proposed action are adequately identified and
evaluated, the agency is not constrained by NEPA from deciding
that other values outweigh the environmental costs."  Id.
Accordingly, NEPA does not impose substantive environmental
obligations on federal agencies, but instead, prohibits
uninformed agency action.  Id. at 351.

     "The purpose of NEPA is to protect the environment, not the
economic interests of those adversely affected by agency
decision."  Nev. Land Action Ass'n v. U.S. Forest Serv., 8 F.3d
713, 716 (9th Cir. 1993); Bor. of Carlstadt v. United States Army
Corps. of Eng'rs, No. 05-2771, 2006 U.S. Dist. LEXIS 4789, at *21
(D.N.J. Feb. 8, 2006).  A plaintiff, therefore, must allege
injury to the environment to have standing to assert a NEPA
claim.  Bor. of Carlstadt, 2006 U.S. Dist. LEXIS 4789, at *21
(stating that alleging economic injury alone without alleging any
injury to the environment is insufficient to confer standing to
assert a NEPA claim).  Organizations with genuine environmental
interests are proper plaintiffs to represent the public's
environmental interests.  Rosebud Sioux Tribe v. McDivitt, 286
F.3d 1031, 1038 (8th Cir. 2002).

### IV. Sovereign Immunity and the Administrative Procedures Act

"Absent a waiver, sovereign immunity shields the Federal government and its agencies from suit." Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475 (1994). The government's immunity is waived only when it consents to suit. See id. "A waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" United States v. Mitchell, 445 U.S. 535, 538 (1980); see Indus. Servs. Corp. v. Comm. for Purchase from People Who are Blind or Severely Disabled, 378 F.Supp.2d 1290, 1292 (D. Colo. 2005) (noting that the government consents to be sued only when Congress unequivocally expresses its intention to waive sovereign immunity in statutory text). "Sovereign immunity is jurisdictional in nature. Indeed, the 'terms of the [United States'] consent to be sued in any court define the court's jurisdiction to entertain the suit.'" Fed. Deposit Ins. Corp., 510 U.S. at 475 (alteration in original).

The Administrative Procedures Act ("APA") provides that:

> [a] person suffering legal wrong because of agency action . . . is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. Accordingly, the APA provides both a waiver of sovereign immunity and the right to judicial review for any

person suffering a "legal wrong" as a result of a government agency action.  See, e.g., NVE Inc. v. Dep't of Health & Human Serv., 436 F.3d 182, 189 (3d Cir. 2006.)

Section 706 of the APA provides that a reviewing court must set aside an agency's action if it finds that, inter alia, it was (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", (2) contrary to a constitutional right or privilege, (3) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right", or (4) in violation of a procedure required by law.  5 U.S.C. § 706(2)(A)-(D).  The burden of proof rests with the party challenging the agency action.  See Frisby v. U.S. Dep't of Hous. & Urban Dev., 755 F.2d 1052, 1055 (3d Cir. 1985).  An agency action is presumed valid, but this presumption does not prevent courts from taking a "hard look" at such actions.  Id.

**V.   The Tucker Act and the Administrative Dispute Resolution Act**

In the context of bid protest claims, plaintiffs historically have relied on two different statutes to waive the government's immunity from suit; the APA, and the Tucker Act as amended by the Administrative Dispute Resolution Act ("ADRA").

The Tucker Act grants the Court of Federal Claims jurisdiction over claims founded on express or implied contracts with the United States.  28 U.S.C. § 1491(a); see Albuquerque v. U.S. Dep't of Interior, 379 F.3d 901, 907 (10th Cir. 2004) ("The

Tucker Act waived the United States' sovereign immunity for some claims, provided the claims are brought in the United States Court of Federal Claims.").  The ADRA amended the Tucker Act in 1996, and provides in relevant part:

> [b]oth the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).  However, the ADRA also stated that the jurisdiction of the district courts, as described in the above-quoted section, would terminate on January 1, 2001 unless it was extended by Congress.  See Pub.L.No. 104-320, 110 Stat. 3870, 3874-75 (1996) ("The jurisdiction of the district courts over the actions described in [28 U.S.C. § 1491(b)(1)] . . . shall terminate on January 1, 2001 unless extended by Congress."); see Albuquerque, 379 F.3d at 907 (noting that the ADRA contained a "sunset provision" stating that the district courts' jurisdiction over actions under 28 U.S.C. § 1491(b)(1) would terminate on January 1, 2001).  Congress did not act, and thus, the ADRA's sunset provision has taken effect.  See Balt. Gas & Elec. Co. v. United States, 290 F.3d 734, 737 (4th Cir. 2002); Albuquerque, 379 F.3d at 907.

Against this backdrop, this Court previously noted that the
ADRA's sunset provision "eliminates the district courts'
authority to entertain government contract protests" even when
jurisdiction is asserted under the APA, not the Tucker Act.
(Dkt. entry no. 34, 7-27-06 Mem. Op., at 11.)  We explained that
the ADRA and its sunset provision forbid district courts from
granting relief to disappointed bidders in bid protest actions
pursuant to the APA.  (Id. at 13.)  See Balt. Gas & Elec. Co.,
290 F.3d at 737 (stating, based on the ADRA's sunset provision,
that federal bid solicitation disputes may only be filed in the
Court of Federal Claims); Novell, Inc. v. United States, 109
F.Supp.2d 22, 24 (D.D.C. 2000) ("[T]here no longer is such an
independent, APA-based jurisdiction for the district courts in
government bid protest cases; rather, Congress effectively
subsumed APA jurisdiction of the district courts into the more
specific jurisdiction language of the ADRA.").

The effect of the ADRA, however, is limited to actions
asserted by an "interested party."  See 28 U.S.C. § 1491(b).  "An
interested party refers only to an actual or prospective bidder
or offeror whose direct economic interest would be affected by
the award of the contract or by failure to award the contract."
Albuquerque, 379 F.3d at 910; see also Am. Fed'n of Gov't
Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001)
(noting that standing pursuant to the ADRA is limited to

interested parties, and therefore is not as broad as standing conferred by the APA).

## RELEVANT FACTS AND PROCEDURAL HISTORY

I. **Facts**

  A. **Overview**

The Gateway National Recreation Area is located along the waterfronts of New York Harbor in both New York and New Jersey. (Dkt. entry no. 43, 2d Am. Compl., at ¶ 14.)  The Sandy Hook unit of the Gateway National Recreation Area includes (1) natural areas with wildlife habitat, forest, beaches, dunes, salt flats, marshes, and coves, (2) the Fort Hancock Historic District, which was part of New York Harbor's defense from the 1890s through World War II, (3) the Sandy Hook Proving Ground Historic District, (4) the Sandy Hook Lighthouse, a national historic landmark, and (5) Spermaceti Cove lifesaving station, also a national historic landmark.  (AR, vol. 19, at 4995-96.)[2]  The Sandy Hook unit contains over 200 historic structures, and approximately 120 of these structures are located in the Fort

_____

[2] The facts contained in this section were taken primarily from the Administrative Record.  The Administrative Record is compiled in 30 volumes of consecutively paginated documents and one Errata volume, which contains documents that were incomplete or incorrectly paginated in the other volumes.  The parties' statements of undisputed material facts are taken primarily from the documents contained in the Administrative Record.  Thus, in discussing the relevant facts in this opinion, we shall primarily cite the Administrative Record by indicating the volume and page number that directly states or supports the particular factual statement (e.g., AR, vol. __, at __).

Hancock Historic District, which consists of buildings that formerly were used to house military personnel.  (Dkt. entry no. 43, 2d Am. Compl, at ¶¶ 19, 21.)  "Taken together, the historical treasures at Sandy Hook cover a span of nearly 350 years of the history of the United States."  (Id. at ¶ 22.)

**B.    The 1995 Programmatic Agreement**

The NPS entered into a new Programmatic Agreement ("PA") in 1995 with the Advisory Council on Historic Preservation ("ACHP") and the National Conference of SHPOs.  (AR, vol. 30, at 9032-52.) Under the PA, the parties agreed, inter alia, that (1) the NPS would "continue to preserve and foster appreciation of the cultural resources in its custody through appropriate programs of protection, research, treatment, and interpretation" in accordance with applicable federal statutes, and (2) all undertakings would be reviewed, for Section 106 purposes, either within the NPS or by the NPS in conjunction with the ACHP and a SHPO.  (Id. at 9033-35.)  The PA specifically listed 13 types of activities in which the NPS could engage without further review by the ACHP or a SHPO, including leasing historic properties where the rehabilitation work under the lease is "limited to action for retaining and preserving, protecting and maintaining, and repairing and replacing in kind materials and features, consistent with the Secretary of the Interior's Standards for Rehabilitation and the accompanying guidelines."  (Id. at 9034-35.)

### C.    The Request for Proposals

The NPS, in August of 1999, issued a Request for Proposals ("RFP") for the lease of all or a portion of 32 historic structures within the Fort Hancock District.  (Id., vol. 5, at 1453-55.)  The RFP stated, "[i]t is the vision of the [NPS] that the elegant buildings at Fort Hancock be returned to year-round use and, to the greatest extent practical, to their original function as office and meeting space, transient lodging, and recreation and entertainment facilities."  (Id. at 1481.)  The RFP contained, inter alia, information about Fort Hancock and the properties available for lease, the NPS's goals, the minimum business terms required for proposals, the required content of any proposal, and information on the evaluation and selection process.  (Id. at 1458-79, 1481-87, 1489.)  In response to the RFP, the NPS received 22 proposals, including proposals from Wassel, Monmouth County Friends of Clearwater, Inc. ("Clearwater"), a nonprofit organization, and the American Littoral Society, also a nonprofit organization.  (Id., Errata vol., at 1773A-1810A.)

Wassel's proposal identified 44 buildings in the Fort Hancock district for potential lease and listed prospective sublessees, including existing tenants like Rutgers/Brookdale and YMCA of Red Bank, a food and beverage contractor, and small to medium sized technology companies.  (Id., vol. 28, at 7377, 7406-

13

07, 7416.)  Wassel's proposal "described a use that [would] be consistent with the preservation of Fort Hancock's historic structures; [and] demonstrate[d] a commitment to building renovation consistent with the Secretary of the Interior's Standards for Treatment of Historic Properties". (Id., Errata vol., at 1807A.)  In March of 2000, the NPS advised Wassel that its proposal had been selected for negotiation. (Id. at 1836A.)

### D.    The Environmental Assessment

The NPS contacted the ACHP and the New Jersey SHPO in the fall of 2000 and asked them to participate in discussions on the rehabilitation of Fort Hancock's historic buildings for adaptive reuse. (Id., vol. 10, at 2781-82.)  On November 8, 2000, the NPS staff and New Jersey SHPO staff held a meeting and walk-through to discuss the possible alternatives for reusing the Fort Hancock Historic District and the potential effects of those alternatives. (Id. at 2838.)  Further, on January 8-9, 2001, the NPS staff, New Jersey SHPO staff, and ACHP staff conducted another walk-through of Fort Hancock's buildings. (Id., vol. 4 at 1157-61; vol. 10, at 2666, 2836.)  Thereafter, in July 2001, the NPS forwarded a draft Environmental Assessment ("EA") "for the Adaptive Reuse of Portions of Fort Hancock and the Sandy Hook Proving Ground Historic District" to the New Jersey SHPO and the ACHP. (Id., vol. 30, at 9438-39.)

14

Wassel, in October 2001, organized defendant Sandy Hook Partners, LLC ("SH Partners") as a New Jersey limited liability company. (Dkt. entry no. 43, 2d Am. Compl., at ¶ 40.)  The NPS and SH Partners executed a "Letter of Intent" in November 2001 committing the parties to enter into a lease pertaining to certain buildings located in the Sandy Hook unit of the Gateway National Recreation Area.  (AR, vol. 2, at 439-43.)  The Letter of Intent was set to expire on November 30, 2002, but it was extended twice.  (Dkt. entry no. 43, 2d Am. Compl., at ¶ 45, 48.)

The NPS, after consulting with a number of federal and state agencies, issued another draft EA in February of 2002 on the adaptive use of Fort Hancock and the Sandy Hook Proving Ground Historic District.  (AR, vol. 9, at 2415-2569.)  On February 15, 2002, the NPS made the draft EA available for public comment. (Id., vol. 5, at 1279-80.)  Moreover, the NPS provided the draft EA to the Eastern Federal Lands Highway Division ("EFLHD") of the Federal Highway Administration so that it could perform a traffic impact assessment in connection with the proposed development of the Sandy Hook unit.  (Id., vol. 13, at 3529-32.)  The EFLHD study ultimately found that:

> no negative traffic operations impact would be caused
> by the proposed development, even under a worst case
> traffic demand scenario; and . . . the New Jersey
> Department of Transportation's (DOT) planned
> improvements, i.e., replacing the existing moveable
> bridge with a fixed bridge, substantially eases traffic
> congestion in the area, and can accommodate any traffic

15

generated by this development.
(Id.)

The NPS also employed an independent consultant in November
of 2002 to study six intersections along State Route 36 and the
Highlands Bridge located on Route 36 to determine whether the
Fort Hancock rehabilitation project would have any impact on the
traffic in that general area.  (Id., vol. 8, at 2196; see vol.
10, at 2731.)  The resulting report was made available for public
review and comment in March of 2003.  (Id., vol. 8, at 2192-2259;
see vol. 10, at 2731.)  The report concluded, inter alia, that
(1) the additional volume generated by the Fort Hancock project
would not significantly increase delays at five of the six
intersections studied along Route 36, (2) the sixth intersection
is expected to operate poorly in the future regardless of whether
the Fort Hancock project goes forward due to other approved
development projects in the area, (3) the Fort Hancock district
would need approximately 665 additional parking spaces to
accommodate the volume associated with the proposed new uses, (4)
the Fort Hancock project would not significantly impact traffic
on the Route 36 corridor during weekday morning peak hours or on
weekends, and (5) the project is not expected to cause
significant local street diversion.  (Id., vol. 8, at 2197-98,
2201, 2244, 2256-57, 2259.)

16

The NPS held public meetings on the draft EA on April 20, 2002, June 1, 2002, and April 12, 2003.  (Id., vol. 5, at 1283, 1285; vol. 10, at 2836-38; vol. 16, at 3912-4214.)  The NPS issued a revised EA in July 2003, which included, inter alia, (1) information from the traffic studies, (2) updated information on recently completed and anticipated projects, and (3) updated correspondence to and from federal and state agencies.  (Id., vol. 10, at 2570-2733.)  The revised EA evaluated two alternatives under the NEPA, NHPA, and associated regulations: (1) a No Action Alternative; and (2) a Rehabilitation Alternative (Proposed Action) that would permit the rehabilitation and reuse of 100 historic structures in the Fort Hancock Historic District. (Id. at 2573-74, 2577, 2585-2618.)  The EA concluded, inter alia, that:

> The No Action Alternative would have a major, long-term impact on the historic buildings in the Fort Hancock and Proving Ground National Historic District.  The continued loss of significant, character-defining features is guaranteed.  The deterioration of the buildings would result in a substantial and highly noticeable change in character-defining features of a large group of elements that contribute to a larger property.  (Id. at 2638.)

> The sense of the historical period of significance, the feeling of the place, would dissolve slowly under the No Action Alternative.  As more historic circulation, building, and cultural landscape features deteriorate and are lost, so too would the military feeling of the landscape.  After some number of years of continued deterioration, the physical features of the National Historic Landmark would not remain sufficiently intact for the property to convey its association with significant historic events.  (Id. at 2639 (emphasis in

17

original omitted).)

Because the Rehabilitation Alternative would be
executed in conformity with the Secretary's Standards,
there would be no negative impact to these contributing
elements of the District [buildings and structures].
The rehabilitation of approximately thirty-seven of 100
buildings in the area of proposed action would have a
major, long-term beneficial effect on this important
collection of resources.  (Id. at 2648.)

The proposed action of replacement of missing historic
trees and foundation plantings at prominent locations
within the Fort Hancock and Proving Ground zones would
have a long-term, major, positive effect on this
cultural landscape component.  The impacts of the
actions would result in a substantial and highly
noticeable positive change in character-defining
features involving a large group of contributing
elements.  (Id. at 2652.)

The EA estimated that under the Rehabilitation Alternative,
approximately 1,200 people would work or study at Fort Hancock on
a weekday, not including the National Coast Guard.  (Id. at
2661.)  Accordingly, Fort Hancock would require 665 additional
parking spaces under the Rehabilitation Alternative.  (Id. at
2603.)  The EA noted that in order to maintain the approved park-
wide total of parking spaces for the entire Sandy Hook unit, 665
parking spaces would be relocated to the Fort Hancock district
from other Sandy Hook unit areas, particularly from overflow
parking area K.  (Id.)  The EA also noted that the added parking
spaces in the Fort Hancock district would impact the cultural
landscape due to the addition of things such as parking surface,
borders, ornamental vegetative screenings, lights, walkways,
gates, entrances, and signs, and would also impact views and

18

vistas on weekdays due to the increased number of cars parked in
the area.  (Id. at 2649-50.)  However, impacts on the visual
quality of the historic district would be mitigated by
configuring the lots around existing trees and using other
landscaping techniques, and choosing the elements associated with
the parking lots, such as the lights and gates, with great care
in an effort to minimize intrusion.  (Id. at 2651.)  Also, the
665 parking spaces added to the Fort Hancock Historic District
would be available to beach goers on weekends.  (Id. at 2603.)

The EA acknowledged that under the No Action Alternative,
impacts from the reuse of Fort Hancock on local traffic would be
negligible.  (Id. at 2645.)  Nevertheless, the EA also stated
that the Rehabilitation Alternative would have only minor, short-
term impacts on local highway traffic.  (Id. at 2664.)  It noted
that anticipated future improvements to the local highway network
would eliminate or reduce any decline in the level of service
along Route 36, and replacing the Route 36 Highlands Bridge would
significantly reduce back-ups at the park's entrance.  (Id. at
2664; see vol. 8, at 2197-98, 2259 (noting that other planned
development in the area around Sandy Hook will cause the level of
service to decrease along Route 36, regardless of the Fort
Hancock rehabilitation, and the Fort Hancock project's
contribution to the decline in service at one of Route 36's
intersections is less than these other development projects).)

19

**E.    The Finding of No Significant Impact**

The NPS released a report discussing the public comments it received in connection with the EA on July 8, 2003.  (Dkt. entry no. 43, 2d Am. Compl., at ¶ 46.)  That same day, it issued a "Finding of No Significant Impact" ("FONSI") with respect to the proposed rehabilitation and adaptive use of 100 nationally significant historic buildings in the Fort Hancock Historic District and the Sandy Hook Proving Ground Historic District. (Id. at ¶ 47; AR, vol. 5, at 1353-75.)  The FONSI stated that the NPS had selected the Rehabilitation Alternative presented in its EA for implementation.  (AR, vol. 5, at 1354.)  The FONSI determined that the Rehabilitation Alternative would not significantly affect the human environment, and thus, it was not necessary for the NPS to prepare an EIS in connection with this project.  (Id. at 1374-75.)  In reaching this determination, the FONSI noted that the adverse environmental impacts of the project would be "negligible to moderate" and there were "no unmitigated adverse impacts on public health, public safety, threatened or endangered species, sites or districts listed in or eligible for listing in the National Register of Historic Places, or other unique characteristics of the region."  (Id. at 1374.)

In discussing the various "intensity" criteria it used to reach its determination that the Rehabilitation Alternative would

20

not significantly affect the human environment,[3] the FONSI

stated, inter alia, that:

> The preferred alternative will stop the deterioration
> of lead paint in buildings, which present safety issues
> to people.  The rehabilitation and continued
> maintenance of the building will mitigate this existing
> health and safety issue.  (Id. at 1366.)[4]

> All rehabilitation actions will be executed in
> accordance with the Secretary of the Interior Standards
> for Rehabilitation.  The collective consequence of the
> Rehabilitation Alternative on the physical condition of
> the landmark property will be long-term, major and
> positive.  There will be a substantial and highly
> noticeable change in the group of elements that
> contribute to the significance of the historic
> district.  There will be major improvements to the
> condition of buildings and ornamental vegetation; there
> will be minor improvements to utilities and small-scale
> features.  This proposal for adaptive use will reverse
> a long-standing trend in the maintenance of the
> property that has led to a deterioration of the
> physical condition of resources.  (Id. at 1367.)

> The rehabilitation alternative will not significantly
> affect sensitive ecological areas within the park
> because the project involves the use or reuse of
> existing buildings, roadways and utilities.  However,

---

[3] "Intensity" is defined in 40 C.F.R. § 1508.27.  (Id. at
1366.)  It is a measure of significance that "refers to the
severity of impacts, which may be both beneficial and adverse,
and considers measures that would be applied to minimize or avoid
impacts."  (Id.)  It is determined by evaluating a number of
criteria.  (Id.)

[4] Similarly, the Court notes that as the Fort Hancock
buildings continue to deteriorate, the installed asbestos fibers
will begin (and may already have begun) to break down and become
airborne causing potential exposure to all who enter the Fort
Hancock Historic District.  See U.S. Environmental Protection
Agency, http://www.epa.gov/asbestos/pubs/asbestos_in_schools.html
(noting that asbestos materials may become hazardous if they are
damaged or deteriorate over time, and thus, release asbestos
fibers into the air).

> parking in Fort Hancock will be expanded to accommodate
> the weekday use by new tenants.  665 new parking spaces
> will be needed in addition to the 708 existing spaces.
> This will be accomplished by creating several small
> parking lots and expanding existing lots within the
> fort. . . .  This will result in the loss of some
> vegetation or potential wildlife habitat.  To offset
> this loss and to insure there is no net increase of
> parking spaces withing the park, an equal number of
> beach parking spaces in area K will be eliminated.
> Parking area K will be replanted with native vegetation
> to restore natural habitat. . . .  It is anticipated
> that the relocation of parking spaces will be
> beneficial in the long term because the park will be
> able to restore a large parcel of land adjacent to
> existing natural habitat. . . .  This habitat will be
> more valuable to wildlife than the existing small,
> disconnected parcels that will be disturbed to improve
> parking in Fort Hancock.  (Id. at 1368.)

The FONSI also explained that the project was not likely to

adversely affect a bird species called the piping plover, the

only endangered species in the area, because construction would

be seasonally restricted in utility corridors and visitor use

would not increase in areas used by the piping plover.  (Id. at

1369-70.)

**F.    The Lease**

SH Partners and the NPS entered into a 60-year lease dated

July 9, 2004 covering 36 buildings in the Fort Hancock Historic

District.  (Id., Errata vol., at 1001A-74A; Dkt. entry no. 43, 2d

Am. Compl., at ¶¶ 49-50.)  The lease does not set forth the

specific intended use of each of the 36 buildings but does

provide that the premises must be utilized on a mixed-use basis

as follows: (1) educational uses must comprise not less than 30%

22

and no more than 50% of the total square footage, (2) conference and meeting spaces must not exceed 40% of the total square footage, (3) general office space must not exceed 30% of the total square footage, and (4) food services and overnight accommodations must not exceed 30% of the total square footage. (AR, Errata vol., at 1023A.)  Further, the lease requires SH Partners to obtain the NPS's approval with respect to its desired use for each building before commencing any improvements required to implement the particular use.  (Id. at 1023A.)  It also requires SH Partners to obtain the NPS's written permission before transferring the lease in whole or in part or subletting the premises in whole or in part.  (Id. at 1044A-45A.)  SH Partners may design all improvements to the leased buildings, but the NPS must approve in writing all design and construction documents.  (Id. at 1025A.)  All such approved design documents will be incorporated as additional attachments to the lease. (Id.)  Any improvements or alterations to the leased buildings must comply with all approved design and construction documents, as well as the lease, all applicable laws, and the Secretary of the Interior's Standards for Treatment of Historic Properties. (Id. at 1028A.)

   The NPS, on the same day it entered into the lease with SH Partners, issued a "Determinations" report, in which it concluded "that the Lease and the uses authorized thereunder are consistent

with the purposes for which the Area was established and that the terms of the Lease will adequately preserve the leased premises." (Id., vol. 4, at 967-71B.)  See 36 C.F.R. § 18.4(a) (requiring the NPS Director to make seven specific determinations before leasing NPS property).[5]  In discussing each of the determinations it made pursuant to 36 C.F.R. § 18.4, the NPS noted, inter alia, that:

> the terms of the Lease require the rehabilitation of
> the leased properties to be accomplished by the lessee

---

[5] Section 18.4(a) provides:

Before leasing property in a park area under this part, the Director must determine that:
(a) The lease will not result in degradation of the purposes and values of the park area;
(b) The lease will not deprive the park area of property necessary for appropriate park protection, interpretation, visitor enjoyment, or administration of the park area;
(c) The lease contains such terms and conditions as will assure the leased property will be used for activity and in a manner that are consistent with the purposes established by law for the park area in which the property is located;
(d) The lease is compatible with the programs of the National Park Service;
(e) The lease is for rent at least equal to the fair market value rent of the leased property as described in § 18.5;
(f) The proposed activities under the lease are not subject to authorization through a concession contract, commercial use authorization or similar instrument; and
(g) If the lease is to include historic property, the lease will adequately insure the preservation of the historic property.

36 C.F.R. § 18.4.

in accordance with the Secretary of the Interior's
[Standards] for Treatment of Historic Properties and
the Secretary of the Interior's Standards for
Rehabilitation, assuring appropriate preservation of
these historic buildings.  This achieves the park
area's purpose of preserving its cultural resources and
also makes available to the public the opportunity to
enjoy the historic environs of Fort Hancock.

The Lease also contains extensive requirements, reviews
and approvals by the NPS to assure that the actions of
the lessee will not result in damage to the area's
natural or recreational resources.  These include
requirements for adhering to all applicable
environmental laws, limiting parking spaces available
to the lessee, limitations on the uses of the leased
buildings, and requirements for NPS approval of all
construction and ground disturbing activities.

(Id. at 969.)  Thus, the NPS made all necessary determinations

before leasing the 36 buildings to SH Partners, including a

finding that the lease would adequately insure the preservation

of the historic properties covered therein.  (Id. at 971B.)

## II.  Claims Asserted and Procedural History

Plaintiffs commenced this action on December 1, 2004,

asserting claims against (1) the Department of the Interior, NPS,

(2) Marie Rust as NPS Regional Director, (3) SH Partners, (4)

Wassel, and (5) the New Jersey  Department of Environmental

Protection.  (Dkt. entry no. 1, Compl.)  Plaintiffs filed an

amended complaint on December 5, 2005, which added Clearwater as

a plaintiff.  (Dkt. entry no. 24, Am. Compl.)  The amended

complaint contained eight counts, and alleged that (1) the lease

to SH Partners will result in the degradation of Sandy Hook, (2)

the lease does not ensure the preservation of the historic

25

properties, (3) the lease does not provide for the payment of the
fair market value of the properties, (4) SH Partners has not
shown that it has the financial capacity to execute the proposed
agreement, (5) the award of the lease does not comply with the
RFP, (6) the lease violates the NEPA, (7) the lease violates the
NHPA, and (8) the NPS's conduct was arbitrary and capricious.
(Id.)

The Federal Defendants moved to dismiss the amended
complaint for lack of subject matter jurisdiction on December 23,
2005.  (Dkt. entry no. 27.)  The Wassel Defendants joined the
motion to dismiss.  (Dkt. entry no. 30, 1-26-06 Heksch Letter.)
In a memorandum opinion dated July 27, 2006, this Court
concluded:

> Counts one, two, six, seven, and eight of the amended
> complaint will be dismissed without prejudice.  If the
> plaintiffs choose to re-file these claims, they are
> directed that the pleading should organize the claims
> by the statute that the defendants are alleged to have
> violated.  Each count should include (1) reference to
> only one statute, and (2) the injury to the plaintiff
> that is associated with the violation of that statute.
> Each count should allege sufficient facts to
> demonstrate standing as to that particular count.
>
> Counts three, four, and five will be dismissed without
> prejudice to assert in the Court of Federal Claims
> should Clearwater choose to do so.  To the extent
> counts three, four, and five are (1) asserted by Save
> Sandy Hook and Coleman as non-bidders, or (2) allege a
> non-bid protest cause of action, they can be re-pled
> pursuant to the instructions governing the other
> statutory claims.

(Dkt. entry no. 34, 7-27-06 Mem. Op., at 34.)  Thus, the Court

dismissed the complaint without prejudice and closed this action.
(Dkt. entry no. 35, 7-27-06 Ord. & Judgment.)

The Court granted Plaintiffs' motion to reopen this action
on December 19, 2006.  (Dkt. entry no. 42, 12-19-06 Ord.)
Plaintiffs then filed a second amended complaint on January 1,
2007 against the Federal Defendants, the Wassel Defendants, and
the New Jersey Department of Environmental Protection alleging,
inter alia, (1) the lease to SH Partners violates the NPSOA, the
GNRA, and the NHPA, and (2) NPS violated the NEPA by entering
into the lease with SH Partners.  (Dkt. entry no. 43, 2d Am.
Compl.)[6]  The Federal Defendants now move to either dismiss the
complaint or for summary judgment, and the Wassel Defendants join
in the motion. (Dkt. entry nos. 50-51; undocketed 4-10-07 Heksch
Letter.)[7]  Plaintiffs cross-move for summary judgment.  (Dkt.
entry no. 55.)  Moreover, Plaintiffs separately cross-move for
(1) a preliminary injunction "enjoining the defendants from
beginning development on Sandy Hook until completion of the
litigation" (dkt. entry no. 62), and (2) "to stay proceedings
pending the completion of the investigation by the Department of
the Interior of the [NPS] concerning the lease of park property

---

[6] Clearwater is not a plaintiff in the second amended
complaint.

[7] The NJDEP has not been served at any point.  Indeed, there
appears to be no allegations directed at the NJDEP in the second
amended complaint.

to [Wassel/SH Partners]" (dkt. entry no. 68).  Both the Federal
Defendants and the Wassel Defendants oppose the separate cross
motions for preliminary injunction and to stay.  (Dkt. entry nos.
65-66, 69.)

**APPLICABLE LEGAL STANDARDS**

**I.    Rule 12(b)(1) Standard**

Rule 12(b)(1) governs a district court's ability to dismiss
a claim for lack of subject matter jurisdiction.  <u>Kehr Packages,
Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406, 1408-09 (3d Cir. 1991).
"Federal courts are courts of limited jurisdiction."  <u>Kokkonen v.
Guardian Life Ins. Co.</u>, 511 U.S. 375, 377 (1994).  They may only
hear actions when authorized to do so by the Constitution or by
statute.  <u>Id.</u>  Congress has the authority to set the boundaries
of the federal courts' jurisdiction within the parameters of the
Constitution.  <u>United States v. Cooper</u>, 437 F.3d 324, 339 (3d
Cir. 2006).  No court has the authority to promulgate a
declaration of jurisdiction.  <u>Id.</u>  Two impediments to the federal
courts' exercise of jurisdiction are sovereign immunity and
standing.  Because the government enjoys sovereign immunity, a
plaintiff cannot bring suit against the government without its
consent.  Further, a federal court cannot exercise jurisdiction

over a plaintiff's claims if such plaintiff has not suffered an injury sufficient to confer standing to bring suit.[8]

The party invoking the Court's jurisdiction bears the burden of persuasion when the subject matter jurisdiction of the Court is challenged.  Rudolph v. Adamar of N.J., Inc., 153 F.Supp.2d 528, 533 (D.N.J. 2001).  Because facial attacks on the subject matter jurisdiction of the Court essentially contest the sufficiency of the pleadings, the Court must determine whether the allegations on the face of the complaint are sufficient to invoke district court jurisdiction.  Gallenthin Realty Dev. Inc. v. BP Prods. of N. Am., 163 Fed.Appx. 146, 149 (3d Cir. 2006) Accordingly, the Court must accept the complaint's allegations as true when assessing subject matter jurisdiction.  Id.

## II.  Summary Judgment Standard

Rule 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323

---

[8] The concept of standing was discussed at length on pages 18-22 of this Court's July 27, 2006 memorandum opinion.  (See dkt. entry no. 34.)

(1986).  Once the movant has met this prima facie burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  A non-movant must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.  Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." <u>Id.</u> at 252.  "By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Id.</u> at 247-48 (emphasis in original).  A fact is material only if it might affect the action's outcome under governing law.  <u>Id.</u> at 248.  "[T]here is no issue for trial unless there is sufficient

30

evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).[9]

### DISCUSSION[10]

I.   NPSOA and GNRA Claim (count one)

Plaintiffs argue that the lease is intended "to turn Fort Hancock into a 'sophisticated, state-of-the-art research office and educational facility and corporate retreat,' and is not compatible with Congress' mandate that the purpose of national parks is 'to conserve . . . and to provide for the enjoyment of [scenery, natural and historical objects, and wildlife therein] in such manner and by such means as will leave them unimpaired

---

[9] The Court has also analyzed the pending cross motions for summary judgment under the legal standard for review of an agency action under the APA.  See Section IV. infra.

[10] The Court notes that Federal Defendants argue that Plaintiffs do not have standing to assert their claims in count one and count two of the second amended complaint because they fail to assert any concrete injury-in-fact with respect to these claims. (Fed. Defs. Br., at 17-21, 38-39.)  Accordingly, Federal Defendants contend that count one and count two should be dismissed for lack of subject matter jurisdiction.  (Id. at 65.) However, the Court finds that in count one and count two Plaintiffs sufficiently (1) reference the statutes they believe defendants are violating, and (2) set forth the specific ways they will be "irreparably harmed" if the relief they seek is not granted. (Dkt. entry no. 43, 2d Am. Compl. at ¶¶ 54, 68, 72, 86.)  Thus, we conclude that Plaintiffs have shown a "sufficient stake" in the controversy to establish standing to assert their claims in count one and count two.  See Pub. Interest Research Group, Inc. v. Powell Duffryn Term., Inc., 913 F.2d 64, 70 (3d Cir. 1990).

for the enjoyment of future generations.'" (Dkt. entry no. 43,
2d Am. Compl., at ¶ 60 (alterations in original).)  Further, they
argue that Wassel did not provide the financial information
required by the RFP when it submitted its bid, and thus, did not
adequately demonstrate the financial capacity to restore the Fort
Hancock Historic District.  (Id. at ¶ 63.)  Accordingly,
Plaintiffs assert that the NPS's lease of the Fort Hancock
properties to SH Partners violates the NPSOA and GNRA because,
inter alia, (1) the NPS permitted SH Partners to refrain from
providing the financial information required by the RFP, but
required other bidders such as Clearwater to comply with such
financial restrictions, and (2) "[t]he proposed uses authorized
by the Lease amount to a thinly disguised corporate office park
in derogation of the purposes and values for which the Sandy Hook
Unit was created and, as a result, will result in the crass
commercialization and privatization of the Sandy Hook Unit in
violation of the purposes and values for which Gateway was
established."  (Id. at ¶¶ 62, 65, 69; see Pl. Br., at 13-15
(arguing that the Court should enjoin the defendants from
permitting the proposed commercial development of Fort Hancock in
accordance with the NPSOA and GNRA to prevent the imminent
deprivation of Plaintiffs' recreational opportunities at Sandy
Hook).)

## A.    Objection to the Lease

The Court concludes, after viewing the underlying factual portions of the Administrative Record in the light most favorable to Plaintiffs, that the NPS's lease with SH Partners does not violate any provision of the NPSOA or the GNRA.  As discussed in more detail above, the NPSOA provides that the NPS is responsible for promoting and regulating national parks and monuments.  16 U.S.C. § 1.  Its responsibilities include conserving historical objects and properties for use and enjoyment by future generations.  Id.  Further, the NPSOA permits the Secretary of the Interior to facilitate the administration of the national park system by leasing a building and associated property under NPS control if certain specified standards are met.  16 U.S.C. § 1a-2(k).  Similarly, the GNRA requires the Secretary of the Interior to inventory and evaluate all structures with potential historical significance located in the Sandy Hook unit, and provide for their preservation, restoration, and utilization.  16 U.S.C. § 460cc-2(g).  Neither the NPSOA nor the GNRA place any specific limitations on how the NPS or the Secretary of the Interior should perform these responsibilities.

The RFP for the Fort Hancock Historic District stated that the NPS intended to return the elegant buildings in that district to their original function and to year-round use.  (AR, vol. 5, at 1481.)  The NPS selected Wassel's proposal in response to the

RFP, which "described a use that [would] be consistent with the
preservation of Fort Hancock's historic structures; [and]
demonstrate[d] a commitment to building renovation consistent
with the Secretary of the Interior's Standards for Treatment of
Historic Properties". (<u>Id.</u>, Errata vol., at 1807A, 1836A.)
Thereafter, the NPS asked the ACHP and the New Jersey SHPO to
participate in the discussions on the rehabilitation of Fort
Hancock's historic buildings for adaptive reuse. (<u>Id.</u>, vol. 10,
at 2781-82, 2838, 2836.)  Also, after consulting with several
state and federal agencies, the NPS issued a draft EA, which was
made available for public comment and forwarded to both the EFLHD
and a private consultant so that they could study the potential
impacts the Fort Hancock rehabilitation project would have on
traffic. (AR, vol. 9, at 2415-2569; vol. 5, at 1279-80; vol. 8,
at 2197-98, 2201, 2244, 2256-57, 2259.)

    The NPS later issued a revised EA that evaluated a No Action
Alternative and a Rehabilitation Alternative under the NEPA,
NHPA, and associated regulations. (<u>Id.</u>, vol. 10, at 2573-74,
2577, 2585-2618.)  The NPS released a report discussing the
public comments it received in connection with the revised EA and
issued a FONSI, which determined that the Rehabilitation
Alternative would not significantly affect the human environment.
(<u>Id.</u>, vol. 5, at 1353-75.)  Thus, SH Partners, which was
organized by Wassel, and the NPS entered into a lease permitting

SH Partners to use and rehabilitate 36 buildings in the Fort
Hancock Historic District.  (Id., Errata vol., at 1001A-74A.)  In
making the determinations required by 36 C.F.R. § 18.4 for leases
of NPS property, the NPS stated, inter alia, that (1) this lease
"achieves the park area's purpose of preserving its cultural
resources and also makes available to the public the opportunity
to enjoy the historic environs of Fort Hancock", and (2) "the
purposes and values of Gateway NRA Sandy Hook Unit and Fort
Hancock will not be degraded but rather enhanced as a result of
the lease . . . and adaptive reuse of the thirty-six historic
buildings to be leased will help preserve the area's distinctive
place in the military history of the United States".  (Id., vol.
4, at 967, 969.)

     The Court concludes, in light of this background, that the
NPS took steps to ensure that its lease with SH Partners would
facilitate the restoration and utilization of the historic Fort
Hancock buildings and the preservation of such buildings for
enjoyment by future generations.  See 16 U.S.C. § 1; 16 U.S.C. §
460cc-2(g).  The NPS has shown that it does not have the
resources to rehabilitate the Fort Hancock Historic District, and
thus, without partnering with entities such as Wassel and SH
Partners, who intend to renovate the buildings in a manner
consistent with the Secretary of the Interior's Standards for
Treatment of Historic Properties, the 36 buildings identified in

the lease will likely fall into further decay and their
historical significance will ultimately be lost.  Therefore, the
Court finds that the NPS did not violate any provision of the
NPSOA or the GNRA by entering into the lease with SH Partners,
but instead such lease promotes the policies underlying those
statutes.

### B.   Objection to the Selection of Wassel's Proposal

District courts are not authorized to grant relief with
respect to bid protest claims because the ADRA's sunset provision
forbids it.  (Dkt. entry no. 34, 7-27-06 Mem. Op., at 13.)  <u>See</u> 5
U.S.C. § 702; <u>Albuquerque</u>, 379 F.3d at 911 (noting that the ADRA
waives sovereign immunity only with respect to actions brought by
an actual or prospective bidder in the Court of Federal Claims).
The effect of the ADRA, however, is limited to claims asserted by
an "interested party."  <u>See</u> 28 U.S.C. § 1491(b); <u>Balt. Gas &
Elec. Co.</u>, 290 F.3d at 736 ("Only an 'interested party' has
standing under the ADRA to bring an action to challenge a bid
solicitation by a federal agency.").  The term "interested party"
encompasses only "actual or prospective bidders or offerors whose
direct economic interest would be affected by the award of the
contract or by failure to award the contract."  <u>Balt. Gas & Elec.
Co.</u>, 290 F.3d at 739.  Moreover, an entity that does not
constitute an "interested party" lacks standing to bring a bid
protest claim.  <u>Id.</u> (concluding that a party that was not an

actual or prospective bidder lacked standing to bring a bid protest action).

Plaintiffs argue that the NPS rejected Clearwater's bid on the basis that it lacked financial capacity, but did not require Wassel to comply with the RFP's requirement that all bidders supply financial information indicating that they have the financial capacity to rehabilitate the applicable Fort Hancock buildings.  (See dkt. entry no. 43, 2d Am. Compl., at ¶ 63.) However, the only injuries Plaintiffs assert as a result of Wassel's bid being selected and Clearwater's bid being rejected are that (1) the "intense commercialization" of Fort Hancock will negatively impact their ability to visit and enjoy the Sandy Hook unit, and (2) they are deprived of the opportunity to participate with Clearwater at Fort Hancock.  (Id. at ¶ 68.)  Thus, Plaintiffs cannot object to the NPS's bid procedure because they were not actual or prospective bidders and their economic interests were not affected by the outcome of the bidding on the Fort Hancock buildings.  See Balt. Gas & Elec. Co., 290 F.3d at 739.  Therefore, Plaintiffs do not have standing to challenge the NPS's bid process or its selection of Wassel and rejection of Clearwater's bid proposals.  See id.  Thus, because Plaintiffs have not made a prima facie showing that the Federal Defendants violated the NPSOA or GNRA by entering into the lease with SH Partners, and they do not have standing to assert a bid protest

40

claim, the Court will grant summary judgment in favor of defendants on count 1 of Plaintiffs' second amended complaint.

## II.   NHPA Claim (count two)

Plaintiffs allege that SH Partners' plans for developing the Fort Hancock properties under the lease "will adversely affect historic properties since, among other things, Wassel's proposal states that its plan will result in the full redesign of the interiors of the available buildings."  (Dkt. entry no. 43, 2d Am. Compl., at ¶ 83 (internal quotations omitted).)  Plaintiffs further allege that the lease violates Section 106 of the NHPA because the NPS failed to consult with the SHPO and awarded the lease to SH Partners "before securing a Memorandum of Understanding, or Programmatic Agreement, to ensure the requisite preservation of the Fort Hancock properties."  (Id. at ¶ 84; see Pls. Br., at 16-17 (arguing that the Administrative Record establishes that the NPS violated the NHPA, particularly Section 106, by failing to take into account the effects the commercial development of the Fort Hancock Historic District would have on the district as a whole and circumventing other procedural requirements set forth in the NHPA).)  This Court disagrees, however, with Plaintiffs' assertions and finds that the NPS has been shown to have satisfied its obligations under the NHPA before entering into the lease.

The NHPA established a federal government policy of
encouraging the public and private sector to preserve and utilize
all usable elements of historic buildings.  See 16 U.S.C. § 470-
1(5).  It requires all federal agencies to assume responsibility
for preserving the historic properties under their control and
permits the agencies to establish and implement practicable
adaptive uses for the historic properties.  See 16 U.S.C. §§
470h-2(a)(1), 470h-3(a).  However, Section 106 of the NHPA and
its accompanying regulations require federal agencies to evaluate
what effects their undertakings will have on the preservation of
historic sites and outlines certain procedures that must be
followed when an agency performs such an evaluation.  See 16
U.S.C. § 470f; 36 C.F.R. §§ 800.3-800.13.

The NPS entered into a PA in 1995 with the ACHP and the
National Conference of SHPOs, pursuant to which the parties
agreed, inter alia, that the NPS could lease historic properties
without review by the ACHP or a SHPO if the rehabilitation work
under the lease was "limited to action for retaining and
preserving, protecting and maintaining, and repairing and
replacing in kind materials and features, consistent with the
Secretary of the Interior's Standards for Rehabilitation and the
accompanying guidelines."  (AR, vol. 30, at 9032-35.)  Thus, the
1995 PA permits the NPS to perform its own Section 106 review
before leasing historical properties under its control without

42

seeking input or further review from the ACHP or a SHPO. (Id.)
Accordingly, the NPS was not required to seek input from the ACHP
or a SHPO in analyzing the potential impacts of the Fort Hancock
rehabilitation project pursuant to Section 106. Nevertheless,
the NPS did seek such input.

The Administrative Record demonstrates that the NPS engaged
in an in-depth assessment of the potential impacts of both its
lease with SH Partners and the Fort Hancock rehabilitation
project as a whole before issuing its FONSI. Specifically, the
Administrative Record shows that, inter alia, the NPS (1)
contacted the ACHP and the New Jersey SHPO in the fall of 2000
and asked them to participate in discussions on the
rehabilitation of Fort Hancock's historic buildings for
adaptative reuse (AR, vol. 10, at 2781-82), (2) held meetings and
walk-throughs with the New Jersey SHPO staff to discuss the
potential effects and alternatives of the plans for
rehabilitating Fort Hancock (id. at 2666, 2836, 2838), (3) issued
draft EAs on the adaptive use of Fort Hancock and the Sandy Hook
Proving Ground Historic District, which were made available for
public comment (id., vol. 30, at 9438-39; vol. 9, at 2415-2569;
vol. 5, at 1279-80; vol. 10, at 2570-2733.), (4) employed the
EFLHD and an independent consultant to assess any potential
traffic impacts that might result from the rehabilitation of Fort
Hancock (id., vol. 13, at 3529-32; vol. 8, at 2196; vol. 10, at

2731), and (5) released a report discussing the public comments
it received in connection with its revised EA (dkt. entry no. 43,
2d Am. Compl., at ¶ 46).  The FONSI ultimately determined that
the rehabilitation of Fort Hancock would not significantly affect
the human environment, and thus, it was not necessary for the NPS
to prepare an EIS in connection with this project (AR., vol. 5,
at 1353-75).

The FONSI expressly stated that the adverse environmental
impacts of the project would be "negligible to moderate" and
there were "no unmitigated adverse impacts on public health,
public safety, threatened or endangered species, sites or
districts listed in or eligible for listing in the National
Register of Historic Places, or other unique characteristics of
the region."  (AR, vol. 5, at 1374.)  Moreover, after issuing the
FONSI, the NPS worked with the staff of the New Jersey SHPO to
draft a PA for the rehabilitation of the historic buildings
located at Fort Hancock.  (AR, vol. 10, at 2787-88.)  The NPS
forwarded the proposed PA and a chronology of its consultation
with the New Jersey SHPO to the ACHP on April 28, 2004, and later
made it available for public comment.  (Id. at 2750-51, 2792-
2801, 2807-08, 2836-37.)  "This PA seeks to prescribe a reviewing
process tailored to the [rehabilitation of the 36 Fort Hancock
buildings covered by the lease] which will stand in place of the
normal Section 106 review process.  Stipulations have been

44

incorporated into the PA that outlines agreed-upon measures that the [NPS] will take in order to avoid, minimize, or mitigate any potential adverse effects."  (AR, vol. 10, at 2570.)

Only after engaging in such extensive efforts to obtain input from various state and federal agencies and the public, and thoroughly evaluating all potential effects of rehabilitating and utilizing the Fort Hancock buildings, did NPS enter into a lease with SH Partners in July of 2004.  (See id., Errata vol., at 1001A-74A; Dkt. entry no. 43, 2d Am. Compl., at ¶¶ 49-50.) Therefore, the Court finds that the NPS has been shown to have adequately performed its Section 106 evaluation with respect to both the lease with SH Partners and the Fort Hancock rehabilitation project in general.  Further, the 1995 PA between the NPS, New Jersey SHPO, and ACHP expressly states that the NPS may enter into a lease of a historic property and perform its own internal Section 106 review without further review by the SHPO or the ACHP.  Thus, with respect to its lease with SH Partners, the NPS went beyond its Section 106 obligations and did consult the New Jersey SHPO and  the ACHP, and is currently attempting to work with these entities to negotiate a final PA with respect to the rehabilitation of Fort Hancock and the Sandy Hook Proving Ground.  Therefore, viewing the Administrative Record in the light most favorable to Plaintiffs, the Court finds that summary

judgment is appropriate in favor of the Federal Defendants and
Wassel Defendants on Plaintiffs' NHPA claim.

### III. NEPA Claim (count three)

Plaintiffs assert that the NPS violated the NEPA when it
entered into the lease with SH Partners because it did not
prepare an EIS on the proposed development of the Fort Hancock
Historic District.  (See dkt. entry no. 43, 2d Am. Compl., at ¶¶
90, 104.)  Specifically, Plaintiffs assert that (1) since issuing
its EA on the Fort Hancock project, the NPS has granted SH
Partners the development rights and easement to an additional 293
parking spaces, and (2) the NPS issued the EA on the Fort Hancock
project without knowing that the lease permits SH Partners and
its tenants to use up to 70% of the premises for commercial
purposes.  (Id. at ¶¶ 95, 98.)  Thus, Plaintiffs contend that the
EA "failed to develop an adequate evidentiary record for its
conclusion that no [EIS] was required" and "failed to develop an
adequate evidentiary record on the environmental impacts of the
intense commercial development and increased parking on the
coastal area".  (Id. at ¶ 101; see Pls. Br., at 18-21 (asserting
that the NPS's decision to issue a FONSI and not prepare an EIS
was arbitrary and capricious because the EA failed to take into
account the impact the proposed development would have on the
surrounding natural environment as a result of increased traffic,
replacement of a bridge, and the necessary addition of parking
spaces).)

Federal Defendants, in contrast, argue that Plaintiffs' factual allegations in count 3 of the complaint are incorrect. (Fed. Defs. Br., at 53.)  Federal Defendants further argue that a "[c]lose reading of the documents shows that plaintiffs have misconstrued the EA, the FONSI and the Lease."  (Id.)  The Court agrees with Federal Defendants and finds that Plaintiffs' NEPA claim is based on erroneous factual inferences.

NEPA requires federal agencies to prepare a detailed EIS for all major federal actions "significantly affecting the quality of the human environment."  Spiller v. White, 352 F.3d 235, 237 (5th Cir. 2003) (alterations and citations omitted).  The EIS must describe, inter alia, the overall environmental impact of the proposed action, any unavoidable adverse environmental impacts of the proposal, and alternatives to the proposed action.  See 42 U.S.C. § 4332(c).  "The threshold determination of whether the effect of the proposed action is sufficiently 'significant' to necessitate the production of an EIS is made by production of an [EA,] . . . a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged [EIS] – which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project – is necessary."  Spiller, 352 F.3d at 237 (citations omitted).  Accordingly, if after completing the EA, the federal agency determines that the proposed project will not have a significant effect on the human

47

environment (_i.e._ reaches a FONSI), NEPA does not require such
agency to produce an EIS.  See _id._ at 238 (noting that if the
agency issues a FONSI it has no further obligations under NEPA).
NEPA places procedural obligations on a federal agency proposing
an action that may affect the environment, but does not in any
way mandate a particular result.  Robertson, 490 U.S. at 350.

### A.   Parking

"A physical inventory conducted in 1999 counted 4218 parking
spaces at beach and bayside developed areas and 708 spaces in
Fort Hancock for a park-wide total of 4926 parking spaces on
Sandy Hook."  (AR, vol. 10, at 2603).  NPS issued a General
Management Plan in 1990 that was intended to ensure that the
Sandy Hook unit's "resource management and visitor use programs
reflect current administrative policies and economic realities."
(_Id._, vol. 19, at 4989-5031.)  The 1990 General Management Plan
proposed the addition of 110 parking spaces to the Fort Hancock
area to accommodate the visitor center, and thus, the approved
park-wide total of parking spaces was increased to 5,036.  (_See
id._, vol. 10, at 2603.)  The EA estimated that under the
Rehabilitation Alternative, approximately 1,200 people would work
or study at Fort Hancock every weekday.  (_Id._ at 2661.)  Further,
the EA noted that the rehabilitation of 100 buildings in the Fort
Hancock Historic District would require the addition of 665
parking spaces in that area, but stated, "[i]n order to maintain

the approved park-wide level within Sandy Hook, 665 spaces will be removed from parking area K and elsewhere and relocated to Fort Hancock." (Id.)  The new parking spaces would be created on previously disturbed land and the removed parking area K spaces would be returned to nature.  (Id.)  The EA provides that these added parking spaces would be available to beach goers on weekends.  (Id. at 2603.)

The lease permits SH Partners to utilize 958 of the parking spaces in the Fort Hancock Historic District on weekdays and 300 parking spaces on weekends.  (Id., Errata vol., at 1070A, 1072A.) However, it does not, as Plaintiffs suggest, state that SH Partners is permitted to construct 293 parking spaces in addition to the 665 spaces the EA anticipated.  (See id.; dkt. entry no. 43, 2d Am. Compl., at ¶¶ 95-97.)  Instead, the lease simply notes that SH Partners, as lessee, will be permitted to use 958 parking spaces, which include both existing parking spaces and those that will be added after parking spaces are removed from areas such as overflow lot K.  Thus, neither the EA nor the FONSI contained incomplete or inaccurate information regarding the impacts the rehabilitation project would have on parking in the Sandy Hook unit.  Therefore, because the NPS completed the EA and reached a FONSI on the basis of complete and accurate information, it had no further obligations under NEPA, including no obligation to prepare an EIS.  See Spiller, 352 F.3d at 238.

49

### B.   Use of the Leased Premises

The EA identified each of the 100 buildings that would be rehabilitated and adaptively used under the Rehabilitation Alternative, including the 36 buildings that would be leased by SH Partners, and listed the proposed use of each building.  (AR, vol. 10, at 2593-2601.)  With respect to the buildings to be leased, the EA listed the following proposed uses: offices, hospitality, park partner, meeting, cafeteria, kitchen, reception/event, cafe/bar, YMCA recreation, post office, commissary, and labs.  (Id.)  Thus, the EA fully anticipated that a portion of the 36 buildings covered by the lease between the NPS and SH Partners would be used for commercial purposes.  (See generally id. at 2570-2733.)

The NPS provided the February 2002 draft of the EA to the EFLHD so that it could perform a traffic impact assessment in connection with the proposed development of the Sandy Hook unit.  (Id., vol. 13, at 3526-32.)  The EFLHD concluded, inter alia, that (1) the proposed development would not negatively impact traffic operations, (2) the DOT's previously planned improvements, including replacing the Highlands drawbridge with a fixed bridge, would alleviate any traffic that might be generated by the rehabilitation project, and (3) the NPS's congestion mitigation actions under a cooperative agreement with other jurisdictions, are "admirable in dealing with congestion and

diverted trips under those periods when Park access is closed due to Park occupancy." (Id. at 3529.)

The NPS also employed an independent consultant in November of 2002 to determine whether the Fort Hancock rehabilitation project would impact traffic in areas beyond the immediate Sandy Hook unit vicinity, such as the Route 36 corridor between the Garden State Parkway and the intersection of Route 520. (Id., vol. 8, at 2192-2259; see vol. 10, at 2731.)  The traffic study created by the independent consultant acknowledged that 100 structures in the Fort Hancock area have been or would be rehabilitated and reused for educational, hospitality, and office purposes. (Id., vol. 8, at 2200.)  The traffic study concluded, inter alia, that (1) the additional volume generated by the Fort Hancock project would not significantly increase delays at five of the six intersections studied along Route 36, (2) the sixth intersection is expected to operate poorly in the future regardless of whether the Fort Hancock project goes forward due to other approved development projects in the area, and (3) the Fort Hancock project would not significantly impact traffic on the Route 36 corridor during weekday morning peak hours or on weekends. (Id. at 2197-98, 2245.)  In reaching its conclusions, the independent traffic consultant considered the draft lease between SH Partners and the NPS and the ratio of total square footage permitted under the lease for educational use, food

51

services and accommodations, general office space, and conference
and meeting space.  (<u>Id.</u>, vol. 13, at 3580-82.)

The NPS issued a revised EA in July 2003 that included the
information contained in the two traffic studies.  (<u>Id.</u>, vol. 10,
at 2662-64.)  The EA concluded that the Rehabilitation
Alternative would have only minor, short-term impacts on local
highway traffic.  (<u>Id.</u> at 2664.)  Further, it explained that
anticipated future improvements to the local highway network
would eliminate or reduce declines in the level of service along
Route 36, and replacing the Route 36 Highlands Bridge would
significantly reduce traffic back-ups at the park's entrance.
(<u>Id.</u>)

The NPS issued a FONSI stating that it had selected the
Rehabilitation Alternative and listing the proposed use for each
building that would be rehabilitated and reused under that
alternative.  (<u>Id.</u>, vol. 5, at 1354, 1357-1360.)  The FONSI noted
that the ratios of uses were "clarified and codified in the
revised draft leases", and thus, further analysis was performed
to determine whether these changes would impact the original
traffic impact assessments.  (<u>Id.</u> at 1361.)  The FONSI determined
that the ratios of uses listed in the revised draft lease would
generate no more than 225 trips during morning peak hours and 216
trips during evening peak hours on the typical weekday.  (<u>Id.</u>)
Therefore, "changes in the ratio of uses in the final draft lease

would generally result in less delay and improved levels-of-service along the travel paths leading to the project site (Route 36 and Ocean Avenue) than the ratios evaluated in the Traffic Impact Study." (Id.)  Also, the FONSI stated that the DOT had advised the NPS that it would not be required to mitigate any potential traffic problems related to the rehabilitation project. (Id.)  The FONSI concluded that the Rehabilitation Alternative did not constitute an action requiring the preparation of an EIS. (Id. at 1374.)

SH Partners and the NPS entered into the lease at issue in July 2004.  (Id., Errata vol., at 1001A-74A.)  The lease does not set forth the specific intended use of each building covered, but, as contemplated by the EA and FONSI, it limits the maximum percentage of the total square footage that can be used for educational purposes, conference and meeting space, general office space, and food services and accommodations.  (AR, Errata vol., at 1023A.)  Thus, a review of the relevant documents suggests that the traffic studies, the EA, and the FONSI were all prepared with full knowledge of the proposed uses of each building covered by the lease, including all commercial uses. Accordingly, because the NPS drafted the EA and issued the FONSI after considering the potential commercial uses contemplated by the lease, the NPS was not required to issue an EIS or perform any other obligations under NEPA.  See Spiller, 352 F.3d at 238.

Accordingly, we find that the NPS did not violate NEPA by failing to produce an EIS, and therefore, summary judgment is appropriate in favor of the Federal Defendants and Wassel Defendants on count three of the second amended complaint.

## IV.  The NPS's Decision to Lease Buildings to SH Partners Was Not Arbitrary, Capricious, an Abuse of Discretion, or a Violation of Law

Throughout the second amended complaint Plaintiffs assert that the lease between the NPS and SH Partners is "arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law."  (Dkt. entry no. 43, 2d Am. Compl., at ¶ 67, p. 26.) Plaintiffs argue that the "use of Fort Hancock and Sandy Hook will substantially change into something it never was nor ever intended to be", and thus, the actions of the NPS violate the GNRA and NPSO and were "clearly arbitrary and capricious and should be set aside by the Court pursuant to section 706 of the APA".  (Pls. Br., at 13.)

The APA, as noted above, provides both a waiver of sovereign immunity and the right to judicial review for any person suffering a "legal wrong" as a result of a government agency action.  See NVE Inc., 436 F.3d at 189.  However, the Court can only set aside the government agency's action if the party challenging the action demonstrates, inter alia, that the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A); see Frisby,

755 F.2d at 1055.  This standard is:

> narrow and a court is not to substitute its judgment
> for that of the agency.  Nevertheless, the agency must
> examine the relevant data and articulate a satisfactory
> explanation for its action including a "rational
> connection between the facts found and the choice
> made."  In reviewing that explanation, we must
> "consider whether the decision was based on a
> consideration of the relevant factors and whether there
> has been a clear error of judgment."  Normally, an
> agency rule would be arbitrary and capricious if the
> agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an
> important aspect of the problem, offered an explanation
> for its decision that runs counter to the evidence
> before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product
> of agency expertise.  The reviewing court should not
> attempt itself to make up for such deficiencies; we may
> not supply a reasoned basis for the agency's action
> that the agency itself has not given.  We will,
> however, "uphold a decision of less than ideal clarity
> if the agency's path may reasonably be discerned."

<u>Motor Veh. Mfg. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S.
29, 43 (1983).

The NPS has considerable discretion to administer, use, and
lease the properties it is tasked with protecting so long as it
complies with applicable environmental laws.  We conclude that
the issuance of the FONSI with respect to the Fort Hancock
rehabilitation project and the lease with SH Partners did not
violate any provision of the NPSOA, GNRA, NHPA, or NEPA.
Further, the Administrative Record demonstrates that the NPS
extensively analyzed all potential impacts of the rehabilitation
and reuse of the Fort Hancock Historic District, including any
impacts that would be caused by the SH Partners lease.

Specifically, the NPS examined all relevant data and articulated a rational and satisfactory explanation in the FONSI for selecting the Rehabilitation Alternative.[11]  It considered all appropriate factors and made all determinations before entering into the lease.  Accordingly, the Court finds that the NPS's decision to lease 36 buildings in the Fort Hancock Historic District to SH Partners was not arbitrary, capricious, an abuse of discretion, or contrary to any law.

### CONCLUSION

The Court, for the reasons stated <u>supra</u>, will (1) grant the Federal Defendants' motion on all counts of the second amended complaint, (2) deny the Plaintiffs' motion for summary judgment, and (3) enter judgment in favor of the Federal Defendants and Wassel Defendants.  The Court will issue an appropriate order and judgment.[12]

          s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

---

[11] The specific steps taken by the NPS are discussed in detail above in both the Facts section and the Discussion sections addressing each of Plaintiffs' claims, and thus, we will not describe them again here.

[12] The Court will dismiss the second amended complaint insofar as asserted against the NJDEP under Rule 4(m), as Plaintiffs failed to serve the NJDEP.  In any event, the Court would have entered judgment in the NJDEP's favor if addressing any claims against it for the reasons discussed above.